JjPETERS, J.
This litigation involves the custodial placement of two minor children, M.V. and C.V., who were adjudicated by the trial court in 1994 to be children in need of care. The instant appeal arises from the trial court’s 1997 decision to maintain the children in foster care pending adoption by their foster parents, hereinafter referred to as John and Jane Doe (the “Does”).[1] The children’s aunt, “Ms. B.,” appeals the trial court’s judgment, asserting three assignments of error.
The current litigation began on June 15, 1994, with the filing in the trial court of a verified complaint by Sharon Hitchens, an employee of the Louisiana Department of Social Services, Office of Community Services (the “department” or the “state”). That complaint asserted that the department had received reports of possible sexual abuse of four minor females, A.V. (born January 16, 1984), K.V. (born February 2, 1985), M.V. (born December 12, 1989), and C.V. (born May 24, 1991). The sexual abuse was alleged to have occurred at the hands of the parents and other family members while the children were in their parents’ custody.
12In this appeal, Ms. B. does not challenge the validity of the state’s initial actions, but focuses on the particulars of the proposed final solution relative to the two younger children. However, analysis of the entire history of the litigation is necessary because of recent and significant statutory changes relating to placement of children in need of care — particularly those changes affecting the question of relative placement.
La.Ch.Code art. 619(A) provides for the filing of a verified complaint by the state in any instance.where “there are reasonable grounds to believe that the child is in need of care and that emergency removal is necessary to secure the child’s protection.” After reviewing the verified complaint, the trial court can issue an instanter order directing that the child be taken into custody if it determines that the child’s welfare cannot be safeguarded without removal from the family home. La.Ch.Code art. 619(C).[2] In this case, based on the allegations in the verified complaint, the trial court issued such an instanter order and granted temporary custody to the state.
The next step in the process is to hold a continued custody hearing within three days from the time the child is taken into custody. La.Ch.Code art. 624(A). At that hearing, the trial court must determine whether there exist “reasonable grounds to believe the child is in need of care and that continued custody is necessary for his safety and protection.” La. Ch.Code art. 626(A). The state bears the burden of proof in that regard. La.Ch. Code art. 624(C). In this case, a timely hearing pursuant to La.Ch.Code art. 624(A) resulted in the trial court continuing custody with the state.
Assuming an informal adjustment agreement cannot be negotiated between the state and the child’s parents, the next step in the process is the filing of a petition to have the child declared a child in need of care. La.Ch.Code art. 631. If the child |3remains in the custody of the state after the continued custody hearing required by La.Ch.Code art. 624(A), the state must file the petition for adjudication within thirty days of that hearing. La.Ch.Code art. 632(A). Additionally, the adjudication hearing must be commenced within forty-five days of the filing of the petition. La. Ch.Code art. 659(A). In this case, the *51 state filed a petition seeking adjudication on July 14, 1994, and the hearing was held on September 6, 1994. Both events were within the statutory deadlines. Absent “exceptional circumstances,” the trial court is required to immediately render judgment after the adjudication hearing. La. Ch.Code art. 666(A). In this case, the trial court did so, finding the four children to be in need of care. Judgment to that effect was signed on September 20,1994.
Once a child is adjudicated as a child in need of care, the next step is to determine the appropriate disposition. La.Ch.Code art. 678 provides:
A. Prior to entering a judgment of disposition, the court shall conduct a disposition hearing.
B. The disposition hearing may be conducted immediately after the adjudication and shall be conducted within thirty days after the adjudication. Such period may be extended for good cause.
(Emphasis added.)
A judgment of disposition is effective until the child’s eighteenth birthday, unless it expires earlier by its own terms, is modified, or is vacated. La.Ch.Code art. 686. The issues to be addressed by the disposition judgment are set forth in La.Ch.Code art. 684. In 1994, that Article read as follows:[3]
A. The court shall enter into the record a written judgment of disposition specifying the following:
(1) The nature of the disposition.
(2) The maximum duration of the disposition.
L(3) The agency, institution, or person to whom the child is assigned, including the responsibilities of any other agency, institution, or person having legal responsibility to secure or provide services to the child which the court has determined are needed.
(4) Any other applicable terms and conditions regarding the disposition.
B. In addition, where the child is to be removed from his parents’ custody, in support of its determination of whether reasonable efforts have been made, the court shall enter findings, including a brief description of what preventive and reunification efforts, or both, were made and why further efforts could or could not have prevented or shortened the separation of the family.
C. An extract of minutes of court specifying the information in Paragraph A of this Article and signed by the court shall be considered a written judgment of disposition.
D. The date of entry of the judgment of disposition shall be recorded on the judgment.
E. Upon request, a copy of the judgment of disposition shall be furnished to the parent.
(Emphasis added.)
Prior to and during the adjudication and disposition process, the department is required to “develop a case plan detailing [its] efforts toward achieving a permanent placement for the child.” La.Ch.Code art. 673. Such a plan is to be filed with the court and mailed to all counsel of record and unrepresented parties at least ten days before any dispositional hearing. La. Ch.Code art. 674.[4] La.Ch.Code art. 675 as it read in 1994 provided:[5]
A. The case plan shall be designed to achieve placement in the least restrictive and most family-like setting available and in close proximity to the parents’ *52 home(s), consistent with the best interest and special needs of the child.
B. The case plan shall include at least the following:
(1) A description of the type of home or institution in which the child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to carry out the judicial determination of reasonable efforts made with |firespect to the return of the child home.
(2) A plan for assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents’ home, facilitate return of the child to his own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.
(Emphasis added.)
There is no case plan in the appeal record, and the record contains no evidence that a disposition hearing was ever held. However, an examination of the adjudication judgment suggests that the trial court entered a judgment of disposition immediately after the adjudication as allowed by La.Ch.Code art. 678(B).
In addition to finding the children in need of care, the trial court ordered that they remain in the custody of the department, that the department continue home studies of three individuals,[6] that the maternal grandparents undergo psychological evaluations, and that the mother be allowed supervised visitation and telephone communication with the children. However, because there was no case plan filed as required by La.Ch.Code art. 674, and because there was no judgment addressing the requirements of La.Ch.Code art. 684, the record is silent as to the post-adjudication long-term plans (or short-term plans for that matter) for the four children.
Once a disposition judgment has been rendered, a review hearing must be held within three months if the child is removed prior to disposition and must be held at least once every six months thereafter. La.Ch.Code art. 692. In each of these hearings, the department is required to comply with the provisions of La.Ch.Code arts. 687-700 “until such time as the child achieves a permanent placement as defined in Article 603(15).” La.Ch.Code art. 687. La.Ch.Code art. 603(15) provides:
| (/‘Permanent placement” means:
(a) Return of the legal custody of a child to his parent(s).
(b) Placement of the child under a guardianship of the person.
(c) Placement of the child with adoptive parents pursuant to a final decree of adoption.
Compliance with the provisions of La.Ch. Code arts. 687-700, pending permanent placement, also requires that the department file a case review report with the trial court at least ten days prior to any review hearing. La.Ch.Code art. 688. At the same time, the department is to forward a copy by certified mail to all counsel of record and any unrepresented party. La.Ch.Code art. 689. The purpose of the report is to review the status of the child in custody and to address specifically:
(1) The continuing necessity for and appropriateness of the placement.
(2) The extent of compliance with the case plan.
(3) The extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care.
(4) A likely date by which the child may be returned to the home or placed *53 for adoption or guardianship of the person of the child.
La.Ch.Code art. 690(B).
From the adjudication judgment of September 20, 1994, until December 9, 1997 (that being the date the judgment at issue in this appeal was rendered), numerous dispositional review hearings were held by the trial court. Despite reference in some post-dispositional-review-hearing judgments to a departmental case plan, no ease plan or plans appear in the record, and this court is left in the dark as to the intentions of the- department concerning permanent placement of these children at any stage of the proceedings.
What is clear is that, from the very outset of these proceedings, Ms. B. consistently requested custody of all four children. However, in 1994 she found that her blood relationship was not an advantage. At that time, La.Ch.Code art. 622 provided:
|7A child taken into custody as a child in need of care shall be placed only in foster care. The department shall supervise the child’s placement for the duration of the time the department has custody of the child.
(Emphasis added.)
Thus, a relative placement was not available unless the relative’s home also qualified as a foster care home.
This philosophy of giving no preference to relative placement was made a part of other statutes governing children in need of care. Following the initial hearing required by La.Ch.Code art. 624 to determine continued custody, the trial court’s options were to “return the child to the parents, continue the child in the custody of the department, or place the legal custody of the child with a suitable person.” La.Ch.Code art. 627(A). Additionally, without special permission from the trial court, a concerned relative could only participate in the adjudication process as a witness. La.Ch.Code arts. 661 and 697. Even after initial disposition, a non-parent relative was not entitled to notice of review hearings unless he or she qualified as a foster parent. La.Ch.Code art. 695.
However, between the time the four children were taken into custody by the state and the hearing at issue in this appeal, a statutory shift in philosophy occurred regarding placement of children in need of care. By Acts 1997, No. 1152, § 1, a pro-relative placement attitude became a part of La.Ch.Code art. 622. Now, pursuant to that amendment, when a child is taken into custody as a child in need of care, he or she “shall be placed in the home of a suitable relative who is of the age of majority and who is willing to assume such care of the child if such placement is in the best interest of the child.” La.Ch.Code art. 622(A)(1) (emphasis added). An aunt willing to assume the care of the child is, in the order of priority, second only to grandparents. La.Ch.Code art. 622(A)(1)(b). The state now bears the burden of proving by clear and | ¡¡convincing evidence that placement of a child with a relative is not in the child’s best interest. La.Ch.Code art. 622(B)(2). Even if a child is placed with nonrelatives after initially being taken into custody, “any suitable relative of the age of majority may petition the court for physical custody of the child.” La.Ch.Code art. 622(D). Ms. B. filed her petition for physical custody on November 26, 1997, which was after the effective date of the amendment.[7]
Almost immediately after custody was granted to the state in 1994, the four sisters were placed in foster homes. However, they were not kept together.[8] Initially, the trial court attempted to maintain visitation and communication opportunities between the children and their mother and *54 maternal grandparents. However, as time lapsed, each of the dispositional-review judgments further curtailed these visitation and communication opportunities. The father, who ultimately went to prison for his involvement in the sexual abuse, was denied any opportunity to communicate with his children from the beginning. On November 30, 1995, he surrendered all parental rights to all four children and authorized their adoption.
Not long after custody was awarded to the state, the department approved Ms. B.’s home as a foster care setting and placed the two older children there. Those children remained in Ms. B.’s foster care until May 16, 1996. On that date, the trial court released them from state custody and named Ms. B. their “guardian.” This action had the effect of permanently placing these children with Ms. B.[9] See La.Ch.Code art. 603(15).
|sOn August 30, 1994, C.V. became the first of the two children at issue to be placed in the foster care of John and Jane Doe. Over a year later, on September 6, 1995, she was joined in that home by M.V. The two sisters have remained with the Does since that time. In May 1996, a few days after the court awarded Ms. B. the guardianship of A.V. and K.V., the state filed a petition to terminate the mother’s parental rights, but only as to C.V. and M.V. Specifically, the department sought this relief so “that said children be freed and made available for adoption.”[10] The trial of this issue was combined with a dispositional review hearing previously scheduled for July 2,1996. The trial court granted the relief requested by the department after a trial held on August 20, 1996. The judgment further provided that the two younger children would remain in the custody of the state and that the department was “to increase therapy and explore increased visits with their siblings in order to intensively address the fears of [M.V.] and [C.V.] toward their siblings, [A.VJ and [K.V.].” The judgment was signed on September 11, 1996. Because the record contains no evidence associated with this hearing and no case management plan, this court can only speculate as to what “fears” were to be addressed.
Despite this court-ordered mandate to facilitate a reuniting of the children, less than five months after the judgment was signed, on January 2, 1997, the state sought and obtained an ex parte order for the cessation of sibling visitation.[11] On the same day, the state requested a hearing to determine the permanent placement of M.V. and C.V. Before this hearing was held, the amendments previously mentioned became law |10and Ms. B. filed her petition for physical custody. The hearing held on December 9,1997, disposed of both of these pleadings and gave rise to this appeal. On that date, the trial court rejected Ms. B.’s petition and continued custody of M.V. and C.V. with the state, pending adoption by their foster parents. The judgment to this effect was signed on December 15, 1997, and further required that the two younger children “remain in counseling with Dr. Pat Post and that structured sibling visits continue now and post-adoption.”
Ms. B. appeals this judgment, asserting three assignments of error: (1) that the trial court erred and/or abused its discretion by approving the permanent placement plan submitted by the department; (2) that the trial court erred in favoring *55 placement, and ultimate adoption, with the Does instead of with Ms. B.; and (3) that the trial court erred and/or abused its discretion by not providing for continued visitation between the two minor children and Ms. B.
The trial court’s oral reasons for judgment are rather lengthy but for a full understanding of the final decision must be set forth. The trial court stated:[12]
This is probably the most difficult case that I have had to deal with since I have been on the bench. It’s difficult because of the fact that there is very strong feeling on, I think, both sides of this matter as to what the facts are to begin with.
The Court has no doubt that the facts embrace, that there was substantial sexual abuse of all — of these children, particularly the younger two.
The record — and I go back as far with the record as anybody in the case, including having handled the criminal side of the father’s conviction and plea, as well as having studied and read all of his admissions and reports that were there.
I do not doubt that the children have been sexually abused. And because of that, I do not doubt that they are suffering, as has been suggested today by at least three of the psychologists that have testified, from post traumatic syndrome stress — or post traumatic stress syndrome.
InNow, when I say, “We are where we are,” I say that sadly, because I feel like that the Court has been in a relationship almost like a co-dependency with a drug addict. I begin every child protection case with the goal of placing the child with family. Because that is where, I believe, the best interest he. But that is not always the case. And the delays that we have had in this case the Court has been a partner in by trying to make sure that family is considered and considered carefully.

The problems that I have with making a decision to place these children with Ms. [B.] relate to the fact that I don’t believe that she truly accepts what the trauma to these children have been, not just in today’s hearing, but in my review of the transcript of both her testimony and Dr. Post’s testimony from our earlier hearing.

I don’t agree with Dr. Boullion that this is like a custody case. As was pointed out in cross-examination, Dr. Boullion, in a custody case you retain both parents. And in this case, if I place the children with Ms. [B.], the parents, the psychological parents, that are available to them in the [Does] will be lost.
However, if I place them with the [Does], we will have a scenario moré like what Dr. Boullion has suggested where, with court direction — and it’s never been an issue with the Court that the children should not have contact and should not have contact encouraged, so that they can develop a future relationship.
But it appears to me that Dr. Brennan’s assessment in this case is the most appropriate one. And I did not realize until we heard the testimony this afternoon, that that — I said “I didn’t realize,” I probably should say I didn’t recall because I’m sure this is part of an earlier court record — that Dr. Ann Pittman Menou had also reached that basic same conclusion even before Dr. Post had been drawn into this with the view of reviewing and taking a closer look at the assessments of Dr. Ann Pittman Me-nou. And here we are again having two more psychologists look at the situation, evaluate it, and try to determine what is in the best interest of the children.

I don’t agree that the placement of the children in [Ms. B.’s] home will be in 
*56
their best interest, because I think that whether [K.V.] and [AM.] were perpetrators of the original abuse or whether they were simply standing in the room when the abuse occurred, they are presently perceived to have been involved in some fashion and are responsible for the post traumatic stress syndrome effects and the remissive behavior that has occurred from time to time with these children.

I believe that this case, while strongly-advocated by both sides, has not crossed the line into personal advocacy on the part of any of the professionals involved in this case. Though I understand that any expert witness is somewhat of a hired gun for the person whom they represent, and I will confess that I found much of Dr. Boullion’s testimony impressive.
I just simply do not agree with the conclusions that he has reached as a result of the testing and evaluation. And I think this is particularly true when we understand that the medical caregivers, the mental health caregivers who have been involved with the children over the longest | ^periods of time and have provided treatment and counseling for them over the longest periods of time, reached the same conclusion that our neutrally selected psychologist or Ms. — Dr. Brennan released presumptively on an independent basis. That it’s important for the children to maintain contact, but it is also important for the therapeutic benefit of these two younger children who have been abused, severely, to have the security and assurance of a stable environment, stable situation, and that they not be again disrupted and expected to adjust before we can begin.
At some point, by the time the children are moved again and resettled, perhaps even placed with a new counselor or therapist, and that therapist settles down all of the issues that are — that arise out of the additional disruption, that the children are going to reach a point and an age where the therapy will ■be difficult, if not impossible, to treat the underlying symptoms and the trauma arising out of the sexual abuse.
I accept the evidence and the evaluation of Dr. Brennan, that Ms. [B.] has done an excellent job with the two older children. But I also believe that the testimony today and the facts that have been revealed through that testimony is that we are not dealing with the two older children when we are dealing with these two younger children, that their abuse experience is ve'i'y different.
And while it’s true that we must live in the real world, in order to bring that child into the real world we’ve have to get the child into an environment where they can start dealing with the real world and to a setting where they can adequately deal with the therapies that are being and need to be offered to them.
I do not believe another move would be in the best interest of the children. And I believe that, again Dr. Brennan is correct in her assessment, that while there is no perfect solution in this case, while the approval of the Court of the State’s permanency plan for these children, which is parental foster care placement with the view of adoption will create a situation of stress for both sets of children to some degree, that it is the lesser of evils, particularly when we couple that with continued therapy and continued contact.

So it would be a part of this court order that therapy be continued and that therapy work toward a goal of continuing to develop the sibling relationship even though they are not in the same home.

Ms. [B.] is a very energetic and a very positive person. My impression of Ms. [B.] from observing her in several hearings and listening to her testimony, is that her “can do” attitude almost prohibits her from seeing some problems. I *57 was struck, particularly in my review of her earlier testimony, in her statements to the effect that she felt that dealing on — dealing with the unpleasant things that happen in the past are like scratching scabs on a sore causing them to continue to bleed, and that she thinks that these things need to be put behind us and go on.
In severe psychological trauma such as this, that only, I think, buries the problem and invites a serious eruption later in the child’s life when it would be even more difficult to deal with than it may be now. With a teenager, with a 17 year old or even a young adult, that would out] — inis a fashion, that would be unmanageable at that age before severe risk to the child’s safety and well being could be — could be prevented.
I see so many people in the delinquency area that remind me of these young people that we are talking about now who did not deal with these issues in the manner that I think is generally accepted in the psychotherapeutic community, who buried them in their mind and their soul, and then only had to face them as teenagers and young adults and became either criminals or drug dependent or alcohol dependent or some other— reached out in some other inappropriate fashion to try to deal with something that they did not understand because they didn’t deal with it much earlier in life, I guess is what I’m trying to say here.
I feel that the — there is clear and convincing evidence in the record, in the extensive psychological testing and evaluations and counseling that have gone over the last three or four years, to cause the Court to believe that the facts that I have stated are true, and that I do believe that it is in the best interest of the children for the State’s plan to be approved.
I do not question Ms. [B.]’s motives. I believe that she is sincere and I think she has obviously done a very good job with the older children. But I do not believe that that same approach, based on what I have heard today, would be successful or effective with the younger children, and I do not think that their best interest would be served by that circumstance.
(Emphasis added.)
The experts referred to by the trial court all testified at the December 9 hearing. Three clinical psychologists, Dr. Patricia Davis Post, Dr. Maureen Brennan,[13] and Dr. Ann Pittman-Menou testified for the state. Each had differing opinions regarding the nature of the sibling relationships, but all three testified that placement in the Doe home was in the best interest of M.V. and C.V. Dr. Kenneth Ray Boullion, a Lafayette, Louisiana clinical psychologist specializing in child psychology, testified on behalf of Ms. B. Specifically, he testified that the best interest of M.V. and C.V. would be served by placing them in Ms. B.’s home.
Dr. Post’s opinions were based almost exclusively on information she obtained 114from M.V., C.V., Jane Doe, and reports written by Dr. Pittman-Menou. She has generally served as “counselor and therapist” to the two younger children since soon after this litigation began and testified that, in her opinion, M.V. and C.V. suffer from posttraumatic stress disorder, which causes them to “act out” in response to recollections triggered by association with the original traumatic source. According to Dr. Post, the only time the younger children seem to behave properly and do not seem to suffer bad dreams is in *58 those extended periods of no contact with their older sisters. In other words, Dr. Post seems to advocate that the children are better off with little or no contact with their older sisters.
Based on a prior report by Dr. Pittman-Menou, Dr. Post concluded A.V. and K.V. even took part in the original sexual abuse of M.V. and C.V. and that they still present a threat to the younger children. Additionally, Dr. Post interpreted several instances of inappropriate behavior on the part of C.V., reported to her by Jane Doe, as associated with visitation with her older sisters and in response to the trial court’s continuation of the custody matter.[14] Dr. Post also seemed to imply that M.V. felt betrayed by the system because she told her older sisters that she did not wish to live with them, but that statement was not sufficient to cause the sibling visitation to cease. Dr. Post was emphatic in her belief that neither of the younger sisters wished to continue communication with their older sisters. However, at the same time, she testified they needed to continue to facilitate a relationship between the siblings, and she was “hopeful” that the Does would respond accordingly.
Despite her concerns, Dr. Post did admit that M.V. and C.V. could adapt to a new home if necessary. She was also aware that M.V. and K.V. had resided together |1Bin the foster home of Mary Johnston for over a year before being moved to Ms. B.’s and the Does’ homes and that there appeared to be no difficulty between the two sisters at that time. By way of explanation, Dr. Post suggested, “her older sister at that time was probably a more secure figure for her than she is currently.” Dr. Post also admitted that, despite her reliance on the accuracy of the history given to her by the two younger children, M.V. has a tendency to lie and to want to please Jane Doe.
Dr. Post also suggested that the children remain in the Does’ custody because they naturally feel safe in that home and are reluctant to consider any possible change. In her opinion, after three and one-half years, to move them again would be “unconscionable.” Her ultimate conclusion on this point was that the only hope of developing a relationship between the older and younger sisters was to quit trying to place them in the same home.
Dr. Brennan was brought into the case in early 1997. Despite agreeing that the best interest of the children would be best served by leaving them with the Does, she and Dr. Post had very different views of the sibling dynamic. Dr. Brennan testified that M.V. and C.V. do not fear their sisters or anyone involved in Ms. B.’s home, but do fear leaving the Does’ home. Additionally, she did not believe A.V. and K.V. posed any threat to M.V. and C.V. Her sole reason for recommending the children remain with the Does was because M.V. and C.V. have been led to believe, and therefore expect, that it will be their permanent home. According to Dr. Brennan, it would be detrimental to the children only because they have lived in the Does’ home for several years, and the most important factor to her was the stability of their environment at this critical stage of their development. Dr. Brennan stated:
Every time a child loses a parental placement or parental figure, there’s some loss, and there certainly would be again this time. I think it heightened this time because for two reasons. One, [M.V.] has some ^expectations that this will be a permanent home, and I’m not sure she had that expectation previously.
My concern in terms of [M.V.’s] ability to form a real healthy relationship and accept nurturing and guidance from Ms. [B.] is the fact that her perception is that Ms. [B.] is doing this to her, whereas before, any anger that she had could be easily directed at the State or social *59 worker or, you know, case of her parents, at them, for hurting her.
Dr. Brennan admitted Ms. B. has the best interest of the children at heart and that any decision should provide for a continued relationship with their older sisters. She also admitted that it was not until M.V. was placed in the Does’ home that allegations of threats by A.V. and K.V. and fear on the part of M.V. and C.V. began. Finally, Dr. Brennan was evasive when asked whether M.V. and C.V. could have bonded to Ms. B. if the department had initially placed them in her home. Both Dr. Brennan and the trial court, in its own examination, agreed that “[w]e are where we are,” implying that it did not matter that Ms. B.’s home may have been the appropriate placement originally. Further, Dr. Brennan did not in the least consider this to be an easy decision.
I think it is a close call, and there are a lot of factors that go in. I think any of us can identify with the needs of the adults as well, you know, and their goals and their objectives. But it still comes down, as I said, there’s not an ideal situation. There’s not one of these— there’s not one answer that’s going to give the kids a straight shot and another that’s going to send them into the toilet. What we’ve got is a need to strike a balance to give these kids the best edge that we can give them.
The trial court addressed specific questions to Dr. Brennan, further indicating the difficulty with the analysis presented. In doing so, the trial court made the following comment:
I’m very concerned abut this case, because I feel like the Court has, perhaps, been a — I’m looking for the word — co-contributor to where we are by trying to make a determination whether it’s in the best interest of the child or the children to remain with family, or whether— which is generally my preference — or whether or not that, in this particular case, 117is not going to work.
And I had hoped that this last series of sessions with the children together with some third person could produce a clear and convincing evaluation that all parties could agree to. Obviously, it has not, because we are still here in litigation in fact, I thought that was the agreement when we left here, was that very serious considerations would be given to this last evaluation.
(Emphasis added.)
Dr. Brennan agreed with Dr. Post’s posttraumatic-stress-syndrome diagnosis and expressed a concern that a change in domicile might trigger all of the symptoms of the condition. In summarizing the effect a change in the children’s custody would have on them, she stated the following:
I think [C.V.’s] difficulties go beyond post traumatic stress. I think she has much greater emotional difficulties than that. Maybe stemming from that and from very early loss and trauma. But I see her as needing very long-term, very consistent care. And her ability to form relationships is already pretty fragile. I think she’s the one that would have the most permanent damage.
I think [M.V.] would be the big pain to deal with and the most disruptive in the short run and would probably give an awful lot of acting out but she is certainly stronger and more stable, and she may refuse to make a relationship with Ms. [B.] I think she’s still going to be in much better shape than [C.V.] to form other relationships. But she’s — it’s also going to be extremely disruptive to her.
She further observed, “I do not see [M.V.] and [C.V.] as being afraid that their sisters are going to molest them at this point. Their biggest fear at this point is that their sisters are going to take them away from their home.” (Emphasis added.) Dr. Brennan described Ms. B. as a kind person who responds very well to children. However, she felt that Ms. B.’s relationship with the two younger children would bet *60 ter prosper if she remained an aunt rather than a parent.
Dr. Boullion testified on behalf of Ms. B., having also become involved in the matter in early 1997. He based his opinion on his review of the department’s entire record (which he described as six or seven inches high); conferences with Ms. Toni |1sBuxton, a department employee; interviews with the four children and Ms. B.; and personality testing of Ms. B.[15] Based on his evaluations, Dr. Boullion concluded that the two younger children were not afraid of their sisters and that they could successfully form a parental bond with Ms. B. It was his further opinion that the department was, from the beginning, very determined to have M.V. and C.V. adopted by the Does. According to Dr. Boullion, the MMPI administered to Ms. B. revealed that she is normal in all respects, but that she is sensitive to criticism. Dr. Boullion did not find this characteristic abnormal in people involved in custody battles.
The final expert testimony was that of Dr. Pittman-Menou, which was presented by the state in rebuttal. Dr. Pittman-Menou was the first professional to become involved with the children and had followed them professionally from June 1994 through the end of 1995. It was Dr. Pittman-Menou who asserted that C.V. initially gave the long, intensive history of abuse (despite being only three years old at the time) on which she relied in reaching her conclusions. She did acknowledge that in December 1995, she, along with Ms. Buxton, visited Ms. B. to consider her for placement of the younger children. Despite the fact that the two older children had been entrusted to Ms. B.’s care for over a year, Dr. Pittman-Menou was concerned that Ms. B. did not fully appreciate the extent of the abuse the children had suffered. However, she came away from that meeting with “a sense that [Ms. B.] fully accepted, or agreed with, or could even acknowledge that some of the things that the girls reported potentially could have happened to them, whether or not they actually happened word for word as the girls reported them to have happened.” She testified hgthat she had never explained to Ms. B. the details of the abuse suffered by the girls, but merely gave Ms. B. “some of the highlights.” Dr. Pittman-Menou also admitted that certain allegations she made in an earlier report concerning Ms. Johnston witnessing inappropriate behavior between C.V. and A.V. were not accurate. This was part of the information relied on by Dr. Post in reaching part of her conclusions.
The lay evidence presented did establish that Ms. B. is the paternal aunt of the four children, being the half sister of their father. However, she was not raised in the same home as the children’s father. She has three children of her own, all over eighteen years of age, one of whom is away at bible college. Ms. B. works as a manager for a finance company, operates her own vending business, and is a Sunday school teacher. She has home schooled her children under an accredited program and plans to continue educating her nieces in that manner. Also, Ms. B. is divorced, but in 1994 had planned to remarry. Her marital plans were not addressed in court, and, thus, her current marital plans are unknown. Ms. B. testified that she could arrange for each child to have her own bedroom and that she wanted the children to be raised as a family.
Initially, the department had nothing but praise for Ms. B. In November 1994, department social counselor Ms. Buxton completed a home study wherein she described Ms. B.’s home as offering a stable and loving environment for the children. Ms. Buxton wrote:
Ms. [B.] cares about what the children are going through and she wants to *61 insure that they are surrounded by people who love them. She wants the four girls to be kept together as a family with their family. She sincerely wants these girls in her home and to help them any way she can. She appears to be deeply distressed and hurt by what her brother did to his children. She feels that her nieces have been traumatized by the abuse they received, by being taken from their parents, by being separated from one another, and by not being able to see the rest of their family. She wants to raise these girls, give them the love they need and keep them | ^together. She has stated that she will follow all agency and court recommendations regarding contact between the children and their parents or other relatives.
Ms. [B.] understands that the children will probably have a large amount of emotional problems over the abuse they received. She has contacted Bethany World Outreach to find out about Christian counseling for the children. If required, Ms. [B.] is willing to take full custody of the children and raise them to adulthood. She feels that she will be able to work with any special needs or problems that any of the children might have. Ms. [B.] realizes that the children have been victimized, but I don’t think she would ever treat them as victims. Her personality and interaction with her own children demonstrate that she is a woman who would work to empower these children and help them develop a positive self-image. She feels anger and confusion toward her brother at the moment and hopes he can find the help he needs because he definitely has a serious problem. She is concerned about [the mother], and recognizes that she has mental problems. She has expressed that she would like to help [the mother] in any way she can. Ms. [B.] is adamant that she will do whatever is required to protect the[se] children from further harm.
Despite this rather glowing report, when Ms. B. requested custody of all four girls in 1994, she was presented with ten reasons why she could not be considered for relative placement. The department informed her that she would not be considered for placement of the two younger children because (1) she was the perpetrator’s sister; (2) her marital plans were, at that time, indefinite; (3) the families of both she and her intended spouse were having to adjust and make changes to the possible marriage; (4) there were space limitations in her home; (5) adequate beds were not available for the children; (6) there was a question of her employment stability; (7) she expressed strong beliefs on corporal punishment; (8) her plans for a permanent residence were indefinite; (9) there was a question of her ability to care for and home school four children, given her already busy life; and (10) there was concern about her leaving the children in the care of her two teenage daughters when she is away.
When Dr. Boullion became involved in 1997, he asked Ms. Buxton why M.V. and C.V. were not placed in Ms. B.’s home and was given seven new reasons. Ms. | a!Buxton told Dr. Boullion that the department felt that (1) Ms. B. did not believe the allegations against the children’s mother; (2) Ms. B. believed that the father was guilty only of that to which he had confessed and that M.V. and C.V. were not hurt by him; (3) Ms. B. thought it was wrong for M.V. and C.V. to be restricted from seeing their maternal grandparents; (4) A.V. inappropriately touched C.V. and therefore that environment would be harmful; (5) Ms. B.’s ability to care for the emotional needs of the children was questionable, as she home schools the children without a college degree; and (7) Ms. B. has five children already (counting A.V. and K.V.) and the Does have six children in their home (counting M.V. and C.V.). Neither the original ten concerns nor the subsequent seven were concerns expressed at the December 1997 hearing. Strangely, these reasons did not deter the state from *62 allowing her to have the permanent guardianship of A.V. and K.V. in May 1996.
At the December 1997 hearing, Ms. B. found it necessary to defend herself and the two older children against numerous unsubstantiated allegations concerning inappropriate behavior with M.V. and C.V. Further, she testified she would obey any order of the court and has modified the way she would correct the children and the manner in which she would provide for their supervision, based on what the department and the court have suggested. A.V. and K.V. also testified, stating they wanted to live with their sisters. Both denied they ever threatened their sisters or acted inappropriately with them or in their presence.
This lay testimony, together with that of Ms. Johnston, contradicted most of the underlying unsubstantiated assumptions made by the state’s experts in reaching their conclusions. For example, M.V. and K.V. resided together for over a year in the foster home of Ms. Johnston, who testified that during that time, she never witnessed M.V. and C.V. exhibit fear of their sisters during sibling visits. She also stated M.V. was |2gvery upset when K.V. went to live with Ms. B. and that M.V. cried often and asked why she could not live with Ms. B. as well. According to Ms. Johnston, M.V. was removed from her home only when it became apparent she was not going to be able to adopt her.
The factual findings of the trial court cannot be disturbed on appeal absent manifest error. Stobart v. State, Through Dep’t of Transp. & Dev., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). Accordingly, the determination about whether a party has discharged its burden of proof should not be disturbed on review absent manifest error. Charles v. South Cent. Indus., 96-0883 (La.11/25/96); 683 So.2d 706.
The burden of proof in this matter rests on the department to prove by clear and convincing evidence that placement of the children with Ms. B. is not in their best interest. To prove by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, much more probable than its nonexistence. Spell v. Conn Appliances, Inc., 97-309 (La.App. 3 Cir. 10/8/97); 702 So.2d 797. In other words, the state must prove that it is highly probable that placing M.V. and C.V. in their aunt’s home would not be in their best interest. As La.Ch.Code art. 622(A)(1) now requires, the department is to first consider relative placement before considering nonrelative placement. The appropriate analysis is not a comparison of Ms. B.’s home and the Does’ home, but rather is an isolated examination of Ms. B.’s home.
The overriding problem this court has in its review of the record is the absence of testimony from M.V., C.V. and the Does, because all 'of the experts’ opinions are based in part on information they claim to have derived from these four individuals- — particularly the derogatory opinions concerning Ms. B. and the older | ^children. As we stated in Ayres v. Beauregard Electric Cooperative, Inc., 94-811 (La.App. 3 Cir. 9/6/95); 663 So.2d 127, 133, writ denied, 95-2434 (La.12/15/95); 664 So.2d 455, “[t]he weight to be given to the testimony of expert witnesses depends largely on their qualifications, their experience, and the facts on which they base their opinions.” (Emphasis added.) Expert testimony is used to “assist the trier of fact to understand the evidence or to determine a fact in issue” and is not used to present the evidence upon which the decision is to be made. La.Code Evid. art. 702. However, the expert opinions based on that which was learned from M.V., C.V., and Jane Doe are based on information which would be considered hearsay. Hearsay is defined as “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” La.Code Evid. art. *63 801(C). Hearsay is generally not admissible. La.Code Evid. art. 802. While it might be argued that the statements relied on by the state’s experts fall within the hearsay exception of La.Code Evid. art. 803(3) to show a then existing mental, emotional, or physical condition, such exception is only relevant if the underlying facts are made part of the record.
The trial court recognized the lack of foundation for much of the experts’ opinions and relied primarily on Dr. Brennan’s opinion as being “the most appropriate one” presented. As previously noted, Dr. Brennan did not rely on all the unsupported insinuations and innuendos in reaching her conclusion that the children should not be placed with Ms. B. Instead, she testified that the most important factor to be considered is the need for stability in the children’s lives at this time. In her opinion, the younger children had been led to believe, and therefore expect, that the Doe home would be their permanent home and to remove them at this time would not be in their best interest. Having found no evidence of their fear of their older siblings, Dr. 1 ¡^Brennan strongly felt that any decision should require a continued relationship with the older sisters. Dr. Boul-lion also testified that he found no evidence of the “fear” the younger sisters supposedly had toward their older siblings. He disagreed with Dr. Brennan only in his conclusion that it was in the best interest of the children to be placed in Ms. B.’s home.
In its reasons for judgment, the trial court further concluded that Ms. B. did not fully accept the trauma the children had suffered and, although impressed with Dr. Boullion’s testimony, did not agree with the conclusions he reached as a result of his testing and evaluation. However, the trial court did err when it concluded evidence existed to suggest that K.V. and A.V. were involved in the initial abuse and therefore were responsible in some way for the posttraumatic stress syndrome suffered by the younger children. The trial court further erred in concluding evidence existed to show the younger children suffered a different kind of abuse than did the older children.
The evidence overwhelmingly points to the conclusion that these four children have not been afforded equal treatment by the state agency given the statutory responsibility for their care. It further overwhelmingly points to the conclusion that Ms. B. was not going to be accepted as custodian for the younger children, regardless of her circumstances. Despite an initial glowing home study of Ms. B.’s home, the department seemed to reach out for any reason, trivial or otherwise, to prevent her from obtaining custody of the two younger children. The actions of the department speak volumes about its intent. One can easily glean from this record that a decision was made by the department early on to work toward an adoption arrangement with the Does for the two younger children. It is disturbing to this court that Ms. B.’s home, while unfit for two of the children, was more than satisfactory for the permanent placement of the other two. It is equally disturbing to observe that the department | ground it necessary to sever the mother’s parental rights as to M.V. and C.V., but not as to A.V. and K.V. — and to do so almost immediately after it had relieved itself of its obligations to A.V. and K.V. by awarding their guardianship to Ms. B. In short, the only conclusion to be reached by this court’s review of the record is that, without rational explanation, the older siblings were disparately treated by the department.
Had these actions transpired after the effective date of Acts 1997, No. 1152, § 1, this court’s decision would amount to a simple reversal of the judgment. Clearly, such a course of action would have violated the statutory mandate in La.Ch.Code art. 622(A)(1) as amended by the 1997 Act. However, the actions in question occurred at a time when relative placement was not a priority. We are left *64 with the only factor existing against placement with Ms. B. being the length of time during which the children have remained in the Does’ home. The question to be answered in Ms. B.’s first assignment of error is whether, in this litigation, that one factor is sufficient for the state to have overcome its burden of proof by clear and convincing evidence. This analysis requires us to compare the expert opinions of Dr. Brennan and Dr. Boullion. In addressing that question, we note that even if a witness is recognized as an expert, the trial court retains the right to accept or reject the expert’s conclusions. State v. Hillman, 613 So.2d 1053 (La.App. 3 Cir.), writ denied, 617 So.2d 1181 (La.1993). We do not find that the trial court was clearly wrong in rejecting Dr. Boullion’s opinions.
Reaching that conclusion, we are left with only Dr. Brennan’s opinion. Her emphasis on stability of environment cannot be contested, and this court certainly agrees with her statement that we must “strike a balance to give [M.V. and C.V.] the best edge that we can give them,” because the best interest of the children is the paramount issue. Therefore, although we may have reached a different conclusion in [ 2fiConsidering all the evidence on this issue, we find no manifest error in the trial court’s determination concerning the significance of this factor.
However, the trial court’s judgment did not stop at simply determining that Ms. B. was not entitled to custody of the two younger children. The judgment specifically provided in part:
Considering the evidence, pleadings, and stipulations, along with the case record in this matter, the Court approves the plan of the Department and enters the following orders pursuant to its reasons given in open court:
IT IS ORDERED that the minor children, [M.V.] and [C.V.], are continued and maintained, in their present placement, pending adoption by the foster parents. They are to remain in the custody of the State, Department of Social Services, Office of Community Services, until further orders of this Court.
The Court finds this placement to be the least restrictive and in the best interest of the children.
IT IS FURTHER ORDERED that the children are to remain in counseling with Dr. Pat Post and that structured sibling visits continue now and post-adoption.
(Emphasis added.)
As in the case of prior hearings, there is no departmental plan in the record, and no evidence was presented at the December 1997 hearing concerning the appropriateness of the Doe adoption. In fact, the only references to the Does’ involvement with the four children are negative.[16] Therefore, the trial court erred in ruling on the adoption issue at this hearing.
Reaching on the testimony of Dr. Post concerning her view' of sibling visitation, the actions of the department in separating these children, and the apparent view of the Does concerning maintaining the sibling relationships, we further conclude the trial court erred in not providing for specific sibling visits in the judgment. Left up to the 1 g7department, based on the history of this litigation, it is doubtful that the sibling relationships would be allowed to exist. Based on that conclusion, we find it necessary to remand the matter for further proceedings on the issue of visitation.
DISPOSITION
For the foregoing reasons, we affirm the trial court’s denial of Ms. B.’s request for *65 custody. We further reverse the trial court’s judgment authorizing adoption by the current foster parents and amend the judgment to provide that M.V. and C.V. remain in custody of the department until further orders of the trial court, leaving for the future the question of adoption. We further reverse that portion of the trial court’s judgment, only insofar as it purports to provide for structured sibling visits to be established by the department. We remand the matter for the trial court to fix a visitation schedule enforceable by the court. Costs of this appeal are to be shared equally between Ms. B. and the department, to the extent allowed by law.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART, AND REMANDED FOR ADDITIONAL PROCEEDINGS.

. For purposes of this opinion only, and in order to maintain the privacy of the children involved, we will refer to the foster parents as "John and Jane Doe,” and we will use initials to represent the names of family members.

. This provision was amended by Acts 1995, No. 1095, § 2, making it clear that the instanter order should direct that the child be taken into the custody of the state.

. Acts 1997, No. 612, § 1, substantially amended the Article, beginning with Paragraph B, but those amendments did not affect the requirements applicable at the time of the initial judgment of disposition.

. This Article was amended by Acts 1997, No. 612, § 1, to require that the case plan be provided in the same manner at least ten days before a case review hearing as well.

.This Article was amended by Acts 1997, No. 612, § 1, requiring the department to include a plan for visitation in the case plan.

. Ms. B. was one of the three individuals studied by the department.

. The effective date of the changes made by Acts 1997, No. 1152, § 1, was August 15, 1997.

. The record and briefs are silent with respect to why the children were separated.

. However, we note that, although the older children were permanently placed with Ms. B., the mother’s parental rights to A.V. and K.V. have never been terminated.

. There is no explanation in the record about why the state did not treat the older children the same as the younger ones and give them a chance for adoption.

.The motion requesting the order was filed by the state and asserted that it had attached to it a copy of a report from Dr. Patricia Post, a clinical psychologist. However, the record does not contain the report as an attachment to the motion and order.

. In this and all following quotations of speech, we have not altered the language to correct grammatical errors or misstatements.

. While the record is not clear as to the relationships of the various psychologists, it appears that Dr. Brennan became involved in the litigation as a result of a January 17, 1997 request by Ms. B. for an additional evaluation. A report from Ms. Toni Buxton addressed to the trial court and dated April 23, 1997, indicates that at the April 2 hearing, it was agreed that Dr. Post and Dr. Boullion would select a third psychologist, and Dr. Brennan was their choice.

. Dr. Post testified that Jane Doe had related an instance where C.V. supposedly mutilated a baby rabbit and other instances where C.V. urinated and defecated in her closet.

. Dr. Boullion administered a Minnesota Multiphasic Personality Inventory (MMPI) test to Ms. B. He described the test as a five-hundred question personality test designed to assess symptoms of anxiety, depression, and defensiveness.

. A.V. and K.V. testified that their younger sisters told them that they had been promised a Florida vacation by the Does once they "belonged to” them; Dr. Brennan testified that the Does allowed M.V. to identify herself as M. Doe; and Dr. Post was, at best, hopeful that the Does would allow M.V. and C.V. a continuing relationship with their older sisters after their adoption.